**CHICAGO, R. I. & G. RY. CO. v. VESERA.***
(No. 1890.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 18, 1922. Rehearing Denied Feb. 15, 1922.)

**1. Appeal and error ⬅757(3)—Requisites of statement in appellant's brief enumerated.**

The statement in appellant's brief, under rule 31 (230 S. W. vii), should contain "a clear and accurate statement of the record" bearing on the propositions on which the appeal is rested, be "entire," and set out the full substance of the evidence.

**2. Master and servant ⬅286(30)—Negligence as to section hand riding on derailed motor car held for jury.**

Evidence in action for injury to a member of a section crew by derailment of a motor car, on which he was riding, through a crowbar falling off the front of it, held to require submission of the issues of whether the car was in a reasonably safe condition, whether it was negligence to run it with the tools loaded as they were in the then condition of the track, and whether there was negligence in the rate of speed.

**3. Release ⬅58(6)—Issue of obtainance by fraudulent representations required by evidence to be submitted.**

Evidence in a servant's action for injury held to require submission of the issue whether a release from damages was obtained by false representations.

**4. Master and servant ⬅137(3)—Care required in placing tools on motor car.**

Though a motor car, derailed by a crowbar falling from the front of it, with resultant injury to a member of the section crew, was one in general use and not in bad condition, yet the master may be held negligent; the troughs thereon for tools not being large enough for all then loaded thereon.

**5. Master and servant ⬅288(6)—Assumption of risk of derailment of motor car held for jury.**

The question of assumption of risk by a member of a section crew, injured by derailment of motor car by falling of crowbar from the front of it, involving questions of fact, held for the jury.

**6. Accord and satisfaction ⬅2(2)—Receipt of wages estimated for time of incapacity from injury not bar to action for injury.**

Mere receipt by injured employé of money voluntarily tendered as wages for a certain number of weeks during which it was estimated he would be in the sanitarium is not bar to action for the injury.

**7. Pleading ⬅139—Pleading of set-off necessary.**

A set-off, to be available, must be pleaded.

Appeal from District Court, Potter County; Henry S. Bishop, Judge.

Action by Quireno Vesera against the Chicago, Rock Island & Gulf Railway Company.

Judgment for plaintiff, and defendant appeals. Reformed and affirmed.

C. E. Gustavus, of Amarillo, and N. H. Lassiter, of Fort Worth, for appellant.

Barrett, Works & Deatherage, of Amarillo, for appellee.

HALL, J. The appellee, Vesera, sued the appellant company to recover damages for personal injuries alleged to have been inflicted upon him while he was engaged in interstate commerce, in the employment of the defendant as a section hand. He alleges in substance that at the end of the day's work the tools were gathered and placed on a motor car, at the direction of the section foreman, to be carried back to the section house; that while proceeding to the section house on the motor car, at a speed of about 20 miles per hour, a crowbar fell from the front of the car and derailed it, throwing the plaintiff to the ground, and injuring him; that he had nothing to do with the loading of the tools on the car, except that he shoved the car along the track while the tools were being loaded upon it by other section men, under the supervision and direction of the foreman. He alleges that the defendant was negligent in the following respects: (1) The car was improperly constructed, in that the place where the tools were to be kept when hauled was only a few inches deep, without edge gates in the ends sufficiently high to hold the tools on the car, the said gates being only 5 to 6 inches in height when they should have been 16 to 18 inches; (2) that the roadbed over which the car was proceeding at the time the crowbar fell off was rough, and on account of this the crowbar was shaken or jolted out of the car; (3) that under the circumstances the car was propelled at a dangerous rate of speed.

Defendant answered, denying that the car was improperly constructed or unstable, and averred that it was of standard construction, properly arranged and equipped to carry the tools and to transport employees; that the plaintiff was an experienced section hand, and had instructions as to the proper method of loading the tools upon the car, and had been instructed that the crowbar should be placed within and at the bottom of the troughs at each side of the car, specially arranged to hold them; that shovels and other small working tools should be put on top of the crowbars; that plaintiff assisted in loading the tools and negligently loaded them at the time in question in disobedience to his instructions and his knowledge of how they should be loaded and that his negligence proximately caused his injury; that the plaintiff was barred from recovery on account of the fact that he had assumed the risk, in that he knew and understood how the bars should be placed on the car, and

had assisted in loading the tools on the car, and, with full knowledge of whatever danger there was, was riding upon the car, thereby assuming all risks of such a situation; that since the accident on December 6, 1920; the defendant company made a settlement with the plaintiff, and paid him the valuable and reasonable consideration of $100, and received from plaintiff a release fully discharging defendant from all liability on account of the injury.

By supplemental petition plaintiff alleged that he was a Mexican, and could not speak or understand the English language; that the defendant's claim agent, through an interpreter, informed him that the $100 to be paid him was merely a payment for the time that he would lose on account of his injury; that the plaintiff did not know the contents and meaning of the release, and believed at the time he executed the release that it was only a receipt for the money paid him for his lost time, and had he known that he was signing anything more than this he would not have executed the release; also at the time and before he signed the release the claim agent told him he was not seriously injured and that the doctor who was attending the plaintiff, and who was acting for the defendant, said that he would be well and able to return to work soon, and the claim agent estimated and stated to the plaintiff that he would be able to return to work in about 5 weeks' time and said that the $100 was paid him for such time so estimated; that such representations were fraudulently made, were believed by plaintiff, and he was thereby induced to execute the release. A trial resulted in a verdict and judgment for plaintiff in the sum of $1,400.

[1] Under appropriate assignments the appellant insists that the court erred: (1) In submitting the issue as to whether or not the motorcar was in a reasonably safe condition at the time of the accident; (2) in submitting the question whether defendant was guilty of negligence in undertaking to haul plaintiff on the car with the tools loaded thereon as they were in the then condition of the track; (3) in submitting the issue as to whether defendant was guilty of negligence in running the car at the rate of speed it was being run at the time; (4) in submitting the issue as to whether the claim agent, at the time the execution of the release made the false representations for the purpose alleged since there was no evidence upon which to base the submission of any such issues. It is further insisted that, even if there is any evidence to support the verdict upon said issues, the testimony as a whole is overwhelmingly against the verdict upon each issue. A consideration of these propositions requires a review of the entire statement of facts. The statement in appellant's brief referring to these contentions is not "a clear and accurate statement of the record" bear-

ing upon the propositions, and does not set out the evidence in accordance with rule 31 (230 S. W. vii), which requires such statement to be "entire." K. C., M. & O. Ry. Co. v. Whittington & Sweeney, 153 S. W. 689.

J. R. McCurdy, who was section foreman at the time and place of the accident, testified that the crew, of which appellee was a member, in their work at the time of the accident, had been using a track jack, track level, track shovels, and lining bars; that the motorcar upon which the section crew went to and from their work had two engines, was about 6 feet long, with a frame about 2 feet high through the center for the men to sit on, and a trough on each side for the tools; that just prior to the accident the five Mexicans, composing the crew, were riding on the frame in the center of the car, and the tools were in the troughs on the sides; that there were at least five shovels, two or three lining bars, one claw bar, one track level, one track gauge, one spike maul, one track jack, and a few other tools. He stated that just prior to the accident the car was running east; that he was on the north side of the car, and was adjusting the carbureter on the motor; that appellee was on the front end of the north side, or left-hand side, of the car, about 2 feet from him; that while he was working with the carbureter he felt a jar, and saw the car leaving the track, and was thrown off. The front end of the car went up, and then tumbled off the track. As soon as he recovered from the fall he saw appellee on the south side of the car, lying on the ground and seemingly unconscious. He noticed one lining bar in the middle of the track, slightly bent. All the tools were thrown off the car, but the others did not appear to be injured. At one place it looked as though the lining bar had stuck in the ground between the ties. There was a hole in the ground between the rails and the cross-ties, something near the center of the track. The bent crowbar was in the center of the track, about where the car left the rails, and was bent something like the center of the bar, not a short bend, but in an oval shape—bent more in the form of a circle; that he had not noticed such mark or bend before the accident. The next morning he noticed a scar or splintered place on part of the woodwork of the car, about 2 or 2½ feet from the east end of the car, where it had been torn or splintered for 2 or 3 inches.

It appears from the statement of facts that appellee was a native of Mexico; that he came to Texas from old Mexico in September, 1920, and could neither speak nor understand the English language. That part of his testimony which relates to the matters urged in the above stated propositions is in part as follows:

"I was riding on the car right behind the foreman, on the left-hand side of the motorcar

going east. We had rode I guess about a mile from where we quit work, until where we got throwed off and I got hurt. I helped put the motorcar on the track that evening, and after that I was pushing the motorcar, and the other men were loading the tools. The tools were scattered up and down the track about 30 feet. No one helped me push the car until after they finished loading the tools. I put in one bar on the car on the right-hand side going east. The section house was east of where they picked up the tools. I was doing what the foreman told me to do. I could not see how the tools were loaded over on the right-hand side of the car from where I was sitting because the other fellows were sitting on the right-hand side and they had their feet all over. There were three men sitting on the other side. My face was toward the north; the left-hand side. I did not see any tools fall off; it was done in just a second and I did not see nothing. There were tools loaded on both sides of the car. The troughs on each side of the car that were used to hold the tools loaded were about 12 inches wide, I guess, and they were about 7 or 8 inches deep. The front end of the troughs were just the same height as the sides. There was nothing at the front end of the troughs, but the end of the trough itself, to keep the tools from shaking off. I could not see the front end of the trough on the right-hand side of the car, for the other Mexicans on the right-hand or south side of the car were sitting there, and obstructed my view of it. The wind was blowing, and it was then getting dark, and the engine had a headlight on it. It was just after 5 o'clock when we quit work. The track along there was in pretty bad shape. The motorcar just shake like that (indicating). We was just begin to fix up where was the worse places, and right there was pretty bad shape when it was running; just jump pretty bad, and the joints was kind of low in places which made the car shake. The motorcar was split right in one corner of it on the south side going east, which would be right-hand side of the car. The split about 10 inches I guess from the front end of the car, and it may be that long (indicating), where it looked like the bar hit it on the right-hand side of the car. That was done when the motorcar was wrecked. None of the lining bars or crowbars were bent before I got hurt. The car was going awful fast when it left the track; faster than it usually run, because we could not hardly stand the wind on the face."

His version of the negotiations with Shed, the claim agent, which resulted in the execution of the release and the payment of the $100 is in substance as follows:

"I have seen Mr. W. K. Shed, the claim agent. The first time I saw him was at the hospital, about 8 days after I was there. He first came in the room about 2 days after I was there, but said nothing and went out. He did not speak to me in Mexican or Spanish language. There was a little girl there; she interpreted for them. Her name is Lola. She came into the room at Mr. Shed's first and second visit. She was just brought in there to interpret for them to tell me something. I didn't make any mark to any paper. Mr. Shed signed my name to a paper there that day, when he told me he was going to pay me 5 weeks' work. Nobody read a paper to me in English there that day. Mr. Shed told me, though this interpreter, he pay me for my hurt, and he was going to pay me just for 5 weeks' work. He told the little girl that he was going to pay me 5 weeks for that—that is what the doctor said he was going to hold me there. I told him I didn't think that was enough, because I was not feeling just exactly right, and I didn't think I was well by that time. Then he said he didn't know how long he was going to be gone, and he could not pay me more than 5 weeks; that is what the doctor said he would hold me there, and what the doctor said it would take me to get well. The little girl told me the $100 was for what days I was there, and after I got out of there I could go to work. * * * The paper that I made my mark to was not read to me by any one there that morning. The little girl told me that Mr. Shed was saying he was going to keep me there 5 weeks; that the doctor has told him in 5 weeks I be well; that the $100 was to pay me for the 5 weeks I be there. If I had known this $100 was to settle for all my damages on account of my being hurt, I would not have taken it. In my work on the railroad in old Mexico we did not use a motorcar; we had a hand car. I knew myself always that the bars had to be loaded first; that is the way we loaded them in old Mexico. I didn't see anything wrong about the way the tools were loaded when I got on the car to ride. They were loaded all right on the side I was riding on. Mr. Shed gave me a piece of paper, and the doctor take it and cash it and bring me the money; it was a piece of red paper. The paper you show me is not that color; the color of this paper is yellow. I think the piece Mr. Shed gave me was a pink color. The same day the doctor took it and cash it. Juan never told me that was the paper, but I was always believing it was for the 5 weeks I was hurt. I didn't understand that the $100 was for my injuries; I understood it was for the time I lost while I was sick. I didn't say yesterday that the $100 was for my injuries and time but just for the time I lost is what I said."

Antonia Gallego, the Mexican girl, who acted as interpreter at the time the release was signed, testified by deposition:

That she was 16 years of age; that she knew the English language and could speak some Spanish, but was not an expert, and could not interpret English into Spanish and Spanish into English very well. She testified that while going to school she had only reached the third grade, and did the best she could to give appellee the words given her by the claim agent. "I interpreted for Mr. Shed twice. The first time was about 2 days after the Mexican came to the sanitarium. The last time, when the release or receipt was signed, Mr. Shed had me to tell him the $100 was for the pain he was suffering, and not for his injuries, and the railroad would pay him for his time later; that the $100 was just to pay him for the suffering and pain. I didn't read the release. Mr. Shed read it to me, and I understood it was a receipt for the $100, upon condition that the

railroad would pay him for his loss, the result of his injuries, and that is what I transferred to Vesera in Spanish the best I could. This is the release witnessed by Miss Lola Couch and myself, and read it the best I could; but I can't pronounce the words, and I don't understand it real well. I cannot say positively whether it is a copy or not, but I guess it is. He was satisfied with the settlement at the time it was made, as he thought he would receive his other pay at a later date, as I told him Mr. Shed said he would receive his pay from the railroad company later, when he got able to go back to work, and Mr. Shed said the doctor told him he would soon be able to go back to work, and I told that to Vesera."

At the trial this Mexican girl was sworn and used as a witness. She said she could speak the Mexican language a little, but had not been speaking it more than a year; that she could only read and write "little words." From her whole testimony it is clear that her knowledge of Spanish is extremely limited, and that her acquaintance with English is not much more extensive. This fact, no doubt, is to some extent the cause of the misunderstanding on the part of appellee and Shed with reference to the release. She said, when appellee came to the hospital, where she was employed as kitchen help, she would go to the ward and talk to him occasionally, and said:

"I could not understand very good what he said to me, because I have to ask them what the meaning of the words were."

With reference to her efforts to interpret for Dr. Rasco she said:

"I did not understand very good what Vesera would say to me, but you see I made him to tell me what the meaning of the words were, and I could not hardly understand him, so I told Dr. Rasco just as good as I could. I could understand the words that he said, and not know what they meant. I could understand his Mexican, but not know what the words all were he used."

Being cross-examined with reference to a conversation she had with appellee's counsel, she said:

"My language to you then was just about— You ask me what I told Vesera the $100 was for, and I said for time lost—no time hurt. That was just about my language, but I did not know what I was saying then. That is not what I told Vesera, but I told you that, and I did not understand it the way you asked me. I remember you asked me to tell you what I told Vesera, and I told you that. I cannot translate into Spanish the words 'the $100 is for time hurt.'"

Because of her limited knowledge of the two languages there are contradictions in the testimony of this witness, and both the witness and appellee are contradicted by other testimony.

[2, 3] The statement of facts is voluminous, but we are convinced, from a careful review of it, that there is sufficient evidence to require the court to submit the issues above mentioned and to sustain the verdict of the jury upon each of the points. The written receipt introduced in evidence released appellant company fully from any and all damages which have or may result from the injury complained of. If the appellee is to be believed, he was misinformed as to its contents at the time he executed it and accepted the $100; and, according to his statement, Shed fraudulently induced him to sign it by representations as to when the doctor said appellee would be able to go back to work, and as to the character and extent of his injuries.

[4] Even though the motorcar was one in general use, and was not in bad condition, yet the evidence tended strongly to show that the two troughs or boxes provided for carrying the tools were not large enough to hold all of the tools on the day of the accident. Skelton & Wear v. Wolfe, 200 S. W. 904; G., C. & S. F. Ry. Co. v. Evansich, 61 Tex. 3; G., C. & S. F. Ry. Co. v. Smith, 87 Tex. 348, 28 S. W. 520.

[5] Appellee did not load the tools. He pushed the car along the track, and the loading was done by the other hands under the direction of the section foreman. It seems that the bar which derailed the motorcar was on the right side of the seats, and appellee could not see it, as he was seated on the left side of the car, and was facing north. He was not responsible for the speed of the car or the condition of the track, over which it was jolting at the time of the accident; nor does it appear that he was cognizant of the danger. These matters all present questions of fact, and we are not authorized to set the findings of the jury aside. Fort Worth & Denver City Ry. Co. v. Smithers, 228 S. W. 637; Railway Co. v. Hynson, 101 Tex. 546, 109 S. W. 929.

[6] The sixth assignment is overruled, for the reason that the appellee understood, at the time he accepted the $100, that it was in payment for the time he had lost and would probably lose while in the sanitarium. The case of Railway Co. v. Morgan (Com. App.) 210 S. W. 512, is not applicable to the facts before us. Here there was no accord, and according to plaintiff's understanding no attempt to satisfy his entire claim. Even the appellant's surgeon did not know the extent of appellee's injuries until long after he was discharged from the sanitarium and an X-ray was made, showing the condition of the bones in his neck. This distinguishes the instant case from the Morgan Case.

[7] Without discussing at length the eighth proposition, which contends that appellant is entitled to a credit of $200, which it paid upon plaintiff's hospital, drug, and doctor's bills, and for the $100 previously paid plaintiff, we deem it sufficient to say that the credit or offset for which claim is here made

in the sum of $200 was not pleaded in the lower court. As to the $100 plaintiff consents to remit that amount. The order of this court, is that, after crediting the judgment below with $100, it be, as reformed, affirmed.

Reformed and affirmed.